UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-0967-CKK |
| U.S. DEPARTMENT OF JUSTICE, | |
| *Defendant*. | |

## DEFENDANT'S STATEMENT OF
## <u>MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE</u>

Pursuant to Local Civil Rule 7(h), Defendant submits this statement of material facts as to which there is no genuine issue.

## I.    Plaintiffs' FOIA Requests

1.    By letter dated May 22, 2017, Plaintiff Judicial Watch submitted a Freedom of Information Act ("FOIA") request to the Federal Bureau of Investigation ("FBI") seeking:

> 1.  Any and all records (sometimes referred to a "memoranda to the file," "memoranda for record," and other variants) written or ordered written by FBI Director James Comey summarizing his conversations with any of the following individuals.
>
> - Barack Obama
> - Joe Biden
> - Hillary Clinton
> - Senator Chuck Schumer
> - Representative Nancy Pelosi
> - Senator John McCain
>
> 2.  Any and all handwritten notes used as the basis for preparing any records responsive to Bullet 1.
>
> The time frame for the requested records is September 4, 2013 to May 9, 2017.

Hardy Decl. ¶ 5 & Exhibit A.

2.    By letter dated May 25, 2017, the FBI acknowledged receipt of Judicial Watch's request and assigned it FOIA Request Number 1374674-000. Hardy Decl. ¶ 6 & Exhibit B.

3.      On February 16, 2018, Plaintiff Daily Caller News Foundation submitted a FOIA request to the FBI seeking:

> [R]ecords that identify and describe all meetings between former FBI Director James Comey and President Barack Obama. This records request is for all meetings with President Obama alone or with meetings with the President in the company of other administration officials.  The request also sought all records that memorialize and describe the meetings between Director Comey and the President, along with meetings with the President in the company of other administration officials.

Hardy Decl. ¶ 7 & Exhibit C.

4.      By letter dated February 26, 2018, the FBI acknowledged receipt of Plaintiff's request through its eFOIPA system and assigned it FOIA Request Number 1396901-000. Hardy Decl. ¶ 7 & Exhibit D.

## II.    The FBI's Search

5.      A search of the FBI's Central Records System ("CRS") would not be reasonably likely to locate responsive records in light of the purpose, design and organization of the CRS, the manner in which the records of the CRS are indexed, and the nature of the requested records. Hardy Decl. ¶¶ 17–19.

6.      The requested records were likely to be located by a search of the FBI's classified and unclassified email systems identifying former FBI Director Comey as the custodian who may have either sent or received emails concerning the subject matter of Plaintiffs' requests. Hardy Decl. ¶ 20.

7.      On or about June 19, 2018, the FBI searched on both its classified and unclassified systems for electronic communications and calendars of former FBI Director Comey using the following search terms: "Obama," "POTUS," "Biden," "Hillary Clinton," "Schumer," "Pelosi," and "McCain."  Hardy Decl. ¶ 20.

8.      The date range was restricted to records created between September 4, 2013 and May 9, 2017 as requested in FOIPA Request Number 1374674-000. Hardy Decl. ¶ 20.

9.      This search yielded responsive records. Hardy Decl. ¶ 20.

10.     Additional responsive records, if they existed, would likely be maintained within the FBI Information Management Division's collection of former Director Comey's records, which were compiled and preserved after his removal. Hardy Decl. ¶ 21.

11.     IMD personnel utilized the search terms "Obama," "POTUS," "Biden," "Hillary Clinton," "Schumer," "Pelosi," and "McCain" to conduct an electronic search of this collection of former Director Comey's records, scoped through any resultant hits from this search to determine if the hits were responsive, and imported any responsive material for processing. Hardy Decl. ¶ 21.

12.     There is no other location or record system reasonably likely to contain responsive documents. Hardy Decl. ¶ 22.

13.     The FBI located 264 total pages of responsive material consisting of 20 pages released in full, 128 pages released in part, and 116 pages withheld in full. Hardy Decl. ¶¶ 4, 14–16.

## III.    The FBI's Withholding of Exempt Information

14.     All documents responsive to Plaintiffs' requests and subject to the FOIA were processed to achieve maximum disclosure consistent with the access provisions of the FOIA. Hardy Decl. ¶ 23.

15.     Every effort was made to provide Plaintiffs with all material in the public domain and with all reasonably segregable non-exempt information in the responsive records. Hardy Decl. ¶ 23.

16.     No reasonably segregable, non-exempt portions have been withheld from Plaintiffs. Hardy Decl. ¶ 23.

17.     Further description of the information withheld beyond what is provided in this declaration, could identify the actual exempt information that the FBI has protected. Hardy Decl. ¶ 23.

A.     Exemption 1: Classified Information

18.     David Hardy has been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13,526, §§ 1.3 and 3.1. Hardy Decl. ¶ 2.

19.     All information that Hardy determined to be classified is marked at the "Secret" level. Hardy Decl. ¶ 31.

20.     Hardy personally and independently examined the information withheld from Plaintiff pursuant to FOIA Exemption 1 and determined that it is currently and properly classified pursuant to E.O. 13,526. Hardy Decl. ¶ 32.

21.     The classified information protected by the FBI in this case is owned by, was produced by or for, and is under the control of the U.S. Government. Hardy Decl. ¶ 33.

22.     The classified information protected by the FBI in this case was classified by an original classification authority. Hardy Decl. ¶ 33.

23.     The classified information protected by the FBI in this case continues to warrant classification at the "Secret" level (as marked on the documents). Hardy Decl. ¶ 33.

24.     Hardy made certain that all procedural requirements of E.O. 13,526 were followed in order to ensure that the information was properly classified. Hardy Decl. ¶ 34.

25.     The classified material here would, if disclosed, reveal an actual intelligence activity and method used by the FBI or disclose the intelligence-gathering capabilities of the activities or methods directed at specific targets. Hardy Decl. ¶ 37.

26.     The information obtained from the intelligence activities or methods is very specific in nature, provided during a specific time period, and known to very few individuals. Hardy Decl. ¶ 37.

27.     Hardy determined that the disclosure of the specific information describing the intelligence activity or method withheld in this case, which is still used by the FBI today to gather intelligence information, could reasonably be expected to cause serious damage to the national security for the following reasons: (a) disclosure would allow hostile entities to discover the current intelligence-gathering methods used; (b) disclosure would reveal current specific targets of FBI's national security investigations; and (c) disclosure would reveal the determination of criteria used and priorities assigned to current intelligence or counterintelligence investigations. Hardy Decl. ¶ 38.

28.     With the aid of this detailed information, hostile entities could develop countermeasures that would, in turn, severely disrupt the FBI's intelligence-gathering capabilities. Hardy Decl. ¶ 38.

29.     This severe disruption would also result in serious damage to the FBI's efforts to detect and apprehend violators of national security and criminal laws of the United States. Hardy Decl. ¶ 38.

30.     The FBI protected detailed intelligence activity information compiled regarding a specific individual or organization of national security interest because disclosure reasonably could be expected to cause serious damage to the national security. Hardy Decl. ¶ 39.

31.     The classified information withheld within these documents contains detailed intelligence activity information gathered or compiled by the FBI on a specific individual or organization of national security interest. Hardy Decl. ¶ 40.

32.     The disclosure of this information could reasonably be expected to cause serious damage to the national security, as it would: (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the method; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time. Hardy Decl. ¶ 40.

33.     The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to Hardy concerning the national defense and foreign relations of the United States. Hardy Decl. ¶ 41.

34.     Each piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files. Hardy Decl. ¶ 41.

35.     Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the United States would have upon the information Hardy examined. Hardy Decl. ¶ 41.

36.     In those instances where, in Hardy's judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, Hardy exercised his prerogative as an original classification authority and designated that information as classified in the interest of national security at the "Secret" level, and invoked FOIA Exemption 1 to prevent disclosure. Hardy Decl. ¶ 42.

37.     The explanations justifying the FBI's withholding of classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found, which includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by hostile intelligence entities. Hardy Decl. ¶ 42.

38.     It is Hardy's judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence sources and methods of the United States could reasonably be expected to jeopardize the national security of the United States. Hardy Decl. ¶ 42.

B.     Exemption 3: Information Protected by the National Security Act of 1947

39.     Intelligence sources and methods would be revealed if any of the information withheld under Exemption 3 is disclosed to plaintiffs. Hardy Decl. ¶ 46.

40.     The FBI applied Exemption 3 in conjunction with Exemptions 1 to protect information that would reveal classified intelligence sources and methods. Hardy Decl. ¶ 47.

41.     The FBI applied Exemption 3 in conjunction with Exemption 7(E) to protect unclassified intelligence sources and methods that were employed as law enforcement techniques, procedures, or guidelines. Hardy Decl. ¶ 47.

C.     Exemption 5: Privileged Deliberative Information

42.     The documents withheld under Exemption 5 were generated and distributed in the context of internal FBI discussions or communications between FBI officials. Hardy Decl. ¶ 50.

43.     The FBI protected advice and suggestions provided to former FBI Director James Comey for various meetings with the President of the United States. Hardy Decl. ¶ 52(a).

44.     These materials are predecisional because they are antecedent to the adoption of agency policy and/or decisions about various aspects of specific investigations to be briefed to the President. Hardy Decl. ¶ 52(a).

45.     These materials are deliberative because they specifically reflect the internal shaping and continuous deliberation of the FBI's position about given law enforcement issues and include proposed topics and issues for discussion or consideration; they therefore reflect an on-going dialogue among and between FBI employees, other government personnel, and other law enforcement agencies. Hardy Decl. ¶ 52(a).

46.     The FBI protected draft talking points for meetings between Director Comey and the President. Hardy Decl. ¶ 52(b).

47.     These records are pre-decisional preliminary versions of what may later become a final document reflecting an agency policy or decision, or what may remain in draft format and never mature into a final, approved form because the material may be withdrawn or discarded during the give and take of the deliberative process leading to a final policy or decision. Hardy Decl. ¶ 52(b).

48.     The information in both types of deliberative material located in the responsive documents are inclusively predecisional because although they influenced the final decision or what was discussed with the President at these meetings, these suggestions were ultimately still subject to any substantive changes based on candid discussions and deliberations between the FBI officials in the case. Hardy Decl. ¶ 53.

49.     Additionally, these documents are also part of a deliberative process; that is, preparing an FBI Director to speak truthfully and factually with the President on a given occasion.

Such information is researched, gathered, analyzed and presented to the Director for consideration before final disclosure (even to the President) is made. Hardy Decl. ¶ 53.

50.    Throughout the electronic communications in this case, there is constant discussion and solicitation of input from top FBI Officials to prepare Director Comey for meetings with the President or the National Security Council. Hardy Decl. ¶ 53.

    D.    Exemption 7: Law Enforcement Information

51.    The FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Hardy Decl. ¶ 55.

52.    Under this investigative authority, portions of the responsive records herein were compiled for law enforcement purposes; they squarely fall within the law enforcement duties of the FBI. Hardy Decl. ¶ 55.

    1.    *Exemptions 7(C) and 6: Invasions of Personal Privacy*

53.    In asserting Exemptions 6 and 7(C), each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. Hardy Decl. ¶ 58.

54.    In each instance where information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure. Hardy Decl. ¶ 58.

a.      Names of FBI Special Agents and Support Personnel

55.      In Categories (b)(6)-1 and (b)(7)(C)-1, the FBI protected the names and identifying information of FBI Special Agents ("SAs") and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities and research reflected in the documents responsive to Plaintiff's FOIA requests. Hardy Decl. ¶ 59.

56.      These agents provided in-depth investigative background, strategy, and future steps for specific FBI investigations which were briefed to the President by Director Comey.

57.      These responsibilities included compiling and analyzing information as well as reporting on the status of investigations to FBI Officials. Hardy Decl. ¶ 59.

58.      Publicity (adverse or otherwise) regarding any particular investigation to which SAs have been assigned may seriously prejudice their effectiveness in conducting other investigations. Hardy Decl. ¶ 59.

59.      FBI SAs conduct official inquiries into various criminal and national security violation cases and come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. Hardy Decl. ¶ 59.

60.      It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years. Hardy Decl. ¶ 59.

61.      These individuals may seek revenge on the agents and other federal employees involved in a particular investigation. Hardy Decl. ¶ 59.

62.      The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent. Hardy Decl. ¶ 59.

63.     Support personnel are assigned to handle tasks related to the official investigations reflected in the documents responsive to Plaintiff's FOIA request. Hardy Decl. ¶ 60.

64.     Specifically, these support personnel assisted FBI agents in gathering specific case research involving background, strategy, and future steps which was briefed to the President by Mr. Comey. Hardy Decl. ¶ 60.

65.     They were, and possibly are, in a position of access to information regarding official law enforcement investigations. Hardy Decl. ¶ 60.

66.      Therefore, these support personnel could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. Hardy Decl. ¶ 60.

67.     Publicly revealing these individual employees' identities or identifying information, by itself, would not significantly increase the public's understanding of FBI operations and activities. Hardy Decl. ¶ 61.

                    b.      Names of Non-FBI Federal Government Personnel

68.     In Categories (b)(6)-2 and (b)(7)(C)-2, the FBI protected the names and identifying information of non-FBI federal government personnel mentioned in records responsive to Plaintiff's requests. Hardy Decl. ¶ 63.

69.     The FBI protected the names and email addresses of Department of Justice, White House, and Bureau of Alcohol, Tobacco, Firearms and Explosives personnel. Hardy Decl. ¶ 63.

70.     Disclosure of these individuals' identities and identifying information could subject these personnel to unauthorized inquiries or harassment, and thus would invade their personal privacy. The same considerations explained in relation to FBI employees apply here in concluding that these employees have demonstrable privacy interests in relation to the responsive records in this case. Hardy Decl. ¶ 63.

71.     There is no public interest in this information because their identities will not shed light on the operations and activities of the federal government. Hardy Decl. ¶ 63.

c.      Names and/or Identifying Information of Third Parties

72.     In Categories (b)(6)-3 and (b)(7)(C)-3, the FBI protected the names and identifying information of third-parties who were merely mentioned in the responsive documents. Hardy Decl. ¶ 65.

73.     The FBI has information about these third parties in its files because these individuals were related either directly or indirectly with the meetings, discussions, or conference calls at issue in the emails responsive to Plaintiff's FOIA requests. Hardy Decl. ¶ 65.

74.     Disclosure of their identities and identifying information in relation to particular meetings, discussions, and conference calls could subject them to unwanted contacts and attempts to learn non-public information about those activities. Hardy Decl. ¶ 65.

75.     Disclosure of their identities would also subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Hardy Decl. ¶ 65.

76.     Disclosing information about individuals merely mentioned in an FBI file would not significantly increase the public's understanding of the operations and activities of the FBI. Hardy Decl. ¶ 65.

d.      Names and/or Identifying Data of Parties of Investigative Interest

77.     In Categories (b)(6)-4 and (b)(7)(C)-4, the FBI protected the names and identifying information of third party individuals who were of investigative interest to the FBI. Hardy Decl. ¶ 66.

78.     Being linked with any law enforcement investigation carries a strong negative connotation and a stigma.

79. To release the identities of these individuals to the public in this context could subject them to harassment or embarrassment, as well as undue public attention, whether or not they ever actually committed a crime. Hardy Decl. ¶ 66.

80. These individuals' identities would not significantly increase the public's understanding of FBI operations and activities. Hardy Decl. ¶ 67.

2.   *Exemption 7(A): Pending Law Enforcement Investigations*

81. The FBI has asserted Exemption 7(A) in a limited fashion to protect the subjects and specific details of pending FBI investigations related to information prepared for various briefings between Director Comey and the President. Hardy Decl. ¶ 72.

82. The release of this information pertaining to on-going FBI investigations could result in the identification of suspects and specific non-public investigative details and thus jeopardize the investigations themselves. Hardy Decl. ¶ 72.

3.   *Exemption 7(E): Investigative Techniques and Procedures*

83. The FBI has protected information, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions, that could reasonably be expected to risk circumvention of the law. Hardy Decl. ¶ 73.

a.   Identity and Location of FBI or Joint Units, Squads, and Divisions

84. In Category (b)(7)(E)-1, the FBI protected the names, numbers, and alpha designators of certain sensitive FBI squads and units. Hardy Decl. ¶ 74.

85. The existence of these particular squads and units is not known to the general public. Hardy Decl. ¶ 74.

86.     Revealing their names, numbers, and alpha designators would reveal the level of focus the FBI has applied to certain areas within the assigned enforcement activity, and as relevant here, to the investigative realm of domestic and international terrorism. Hardy Decl. ¶ 75.

87.     The release of these unit identities could reasonably be expected to risk circumvention of the law as follows would provide a piece of information about the application and focus of FBI investigative capabilities and presence in the associated geographical area(s). Hardy Decl. ¶ 75.

88.      This piece of information alone identifies the particular unit's internal designation, its geographical disposition, and its primary activity. Hardy Decl. ¶ 75.

89.     When combined with other information in a mosaic fashion, this piece of information provides key insight into limited FBI resources that are employed in this type of enforcement activity in a particular area. Hardy Decl. ¶ 75.

90.     If adversaries are provided the pieces necessary to construct this mosaic, then the method of the investigative process revealed by the mosaic would be disrupted and the FBI would be deprived of valuable information. Hardy Decl. ¶ 75.

91.     The disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law. Hardy Decl. ¶ 75.

b.     Sensitive White House Phone Number

92.     In Category (b)(7)(E)-2, the FBI protected a secure sensitive telephone number at the White House on Bates page FBI-18-CV-00967-77. Hardy Decl. ¶ 76.

93.     Release of this sensitive phone number could allow individuals either of investigative interest or otherwise to exploit the U.S. government secure communication systems—to gain unauthorized access to, view, and manipulate data on, or otherwise interfere

with, the White House's non-public communication network with a the secure line to sensitive discussions with the President and other high level U.S. government officials. Hardy Decl. ¶ 76.

94.     Such actions could arm adversaries with the information or ability to circumvent the law or interfere with law enforcement or intelligence gathering activities. Hardy Decl. ¶ 76.

c.     Collection and Analysis of Information

95.     In Category (b)(7)(E)-4, the FBI protected methods that the FBI uses to collect and analyze the information that it obtains for investigative purposes. Hardy Decl. ¶ 77.

96.     The release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it once collected. Hardy Decl. ¶ 77.

97.     Such disclosures would enable subjects of FBI investigations to circumvent similar currently used techniques. Hardy Decl. ¶ 77.

d.     Investigative Focus of Specific Investigations

98.     In Category (b)(7)(E)-5 to protect information that could potentially reveal the investigative focus of specific FBI domestic and international terrorism investigations. Hardy Decl. ¶ 80.

99.     Revealing the broader investigative focuses, at times relating to interconnected investigations, would reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal and terrorist related activities. Hardy Decl. ¶ 80.

100.     Release of this type of information would allow criminals and terrorists to gauge the FBI's strengths and weaknesses within certain areas of the criminal and terrorist arenas and structure their activities in a manner that avoids detection and disruption by the FBI. Hardy Decl. ¶ 80.

e.       Sensitive Database Information

101.    In Category (b)(7)(E)-6, the FBI protected declassified information specifically gleaned from a non-public database used for official law enforcement purposes by the FBI and/or other law enforcement personnel on only one page: FBI-18-CV-00967-202. Hardy Decl. ¶ 81.

102.    The protected database is designed for collecting and sharing terrorism-related activities amongst law enforcement agencies across federal, state, local, tribal jurisdictions as well as national fusion center networks. Hardy Decl. ¶ 81.

103.    This non-public database, therefore, serves as a repository for counterterrorism and investigative data.  It allows law enforcement to query information and develop investigative leads from a variety of source data using state-of-the-art analytical tools.  FBI personnel as well as task force members from local, state and other federal agencies have access to this database. Hardy Decl. ¶ 81.

104.    Disclosure of the information directly gleaned from this database could educate criminals as to the types of information/evidence most useful to the FBI based on the nature of the FBI's investigative databases and the information they house. Hardy Decl. ¶ 81.

105.    It would also reveal the FBI's capabilities and limitations governing what types of investigative information it can track and later query when developing investigative/law enforcement strategies. Hardy Decl. ¶ 81.

106.    Bates page FBI-18-CV-00967-202 is part of a full investigative report generated by the FBI analyzing information gathered from this sensitive database for a specific sensitive investigation. Hardy Decl. ¶ 81.

107.    Revealing the specific piece of information protected under this category would allow criminals to employ countermeasures to deprive the FBI of critical investigative data and/or

predict FBI investigative responses in particular investigative situations, thus jeopardizing the FBI's investigative mission. Hardy Decl. ¶ 81.

f.      Sensitive File Numbers

108.    In Category (b)(7)(E)-7, the FBI protected sensitive case file numbers on four (4) pages which the FBI has withheld in full – FBI-18-CV-00967-191-192 and 201-202. Hardy Decl. ¶ 82.

109.    FBI file numbers are created solely because of FBI investigations. Hardy Decl. ¶ 82.

110.    The release of the file numbering convention identifies the investigative interest or priority given to such matters. Hardy Decl. ¶ 82.

111.    Applying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities, etc. Hardy Decl. ¶ 82.

112.    It is the assemblage of file numbers that risks harm if disclosed, not generally a single classification code in total isolation. Hardy Decl. ¶ 82.

113.    To determine the sensitivity of certain file numbers, the FBI conducts a case-by-case analysis when determining whether to release a file number. Many factors go into this analysis such as the type or program under which the file number falls, whether the file is pending or closed, the subject or focus of the file, whether a file number has been previously released, and its interrelatedness with other criminal and/or national security investigations. Hardy Decl. ¶ 83.

114.    These contextual factors become a type of litmus test to determine on a case-by-case basis if a file number can be released without harm or must be redacted. Hardy Decl. ¶ 83.

115.    In this case, the only mention of specific FBI file numbers were on these four pages, and through this litmus test the FBI determined these file numbers did meet the threshold for protection under FOIA Exemption 7(E). Hardy Decl. ¶ 83.

g.    Dates and Types of Investigations

116.    In Category (b)(7)(E)-8, the FBI protected information pertaining to the types and dates of investigations referenced in four (4) pages at issue in this case – FBI-18-CV-00967-191-192 and 201-202. Hardy Decl. ¶ 84.

117.    The information withheld, when referenced in connection with the actual investigation at issue and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the date it was initiated. Hardy Decl. ¶ 84.

118.    Disclosure of this information would allow individuals to determine the types of activities that would trigger a full investigation as opposed to merely a preliminary one, as well as the particular dates the investigation covers, which would allow individuals to adjust their behavior accordingly to circumvent the law. Hardy Decl. ¶ 84.

119.    The knowledge that a specific activity warrants investigation could likewise cause individuals to adjust their conduct to avoid detection. Hardy Decl. ¶ 84.

h.    Internal Non-Public Intranet Email Addresses and Phone Numbers

120.    In Category (b)(7)(E)-9, the FBI protected internal non-public Intranet email addresses as well as phone numbers specific to the FBI on two (2) pages – FBI-18-CV-00967-194 and 200. Hardy Decl. ¶ 85.

121.    Release of these pieces of information could allow individuals to exploit the FBI's Information Technology system to gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's unclassified, but non-public Intranet protocol. Hardy Decl. ¶ 85.

122.    Such actions could arm individuals with the information or ability to circumvent the law by hacking or otherwise exploiting the FBI's system. Hardy Decl. ¶ 85.

123.    Additionally, release of this information would also allow individuals to disrupt official FBI business. Hardy Decl. ¶ 85.

**IV.    Other Nonresponsive Citations**

124.    The FBI considers each individual message in an e-mail chain to be a separate record and therefore analyzes each individual message for both responsiveness and exemptions. Hardy Decl. ¶ 85.

125.    Because multiple topics may be addressed across the various messages in an e-mail chain, some messages may be responsive whereas others may not, depending on the specific parameters of a FOIA request. Hardy Decl. ¶ 85.

126.    As relevant here, the FBI out-scoped non-responsive messages on Bates page FBI-18-CV-00967-11 and 12. Hardy Decl. ¶ 85.

127.    Additionally, the FBI out-scoped one page in full – FBI-18-CV-00967-78 –because it was comprised fully of individual e-mail messages that were not responsive to the FOIA requests at issue in this case. Hardy Decl. ¶ 85.

**IV.    Documents Referred to the White House for Consultation**

128.    The FBI identified pages, some in their entirety and some in part, containing information and/or equities originating with other government agencies. Hardy Decl. ¶ 87.

129.    On September 27, 2018, the FBI sent 22 pages to the White House for consultation – i.e., Bates pages FBI-CV-00967-111-112, 114-116, 127-134, 144, 160-161, 163-164, 166-168 and 246. Hardy Decl. ¶ 88.

130.    On October 30, 2018, the White House responded to the consultation request and asked that certain information be withheld to FOIA Exemptions (b)(5) and (b)(6) on all pages except Bates pages FBI-CV-00967-166 through 168 (these specific pages were released in full). Hardy Decl. ¶ 88.

131.    For Bates pages 111-112, the withheld information relates to confidential advice provided directly to the President and his close advisors regarding a national security topic. Hardy Decl. ¶ 89.

132.    Release of this information would reveal the process by which the President receives national security advice from close advisors as directed by President Obama under Presidential Policy Directive-1 (Organization of the National Security Council System), and would reveal information about the advice itself. Hardy Decl. ¶ 89.

133.    For Bates page 114, the withheld information relates to the topics of confidential advice provided directly to the President and his close advisors. Hardy Decl. ¶ 90.

134.    Release of this information would reveal the process by which the President receives national security advice from close advisors as directed by President Obama under Presidential Policy Directive-1 (Organization of the National Security Council System), and would reveal information about the advice itself. Hardy Decl. ¶ 90.

135.    For Bates pages 115-116, the withheld information relates to the topics of confidential advice provided directly to the President and his close advisors. Hardy Decl. ¶ 91.

136.    Release of this information would reveal the process by which the President receives national security advice from close advisors as directed by President Obama under Presidential Policy Directive-1 (Organization of the National Security Council System), and would reveal information about the advice itself. Hardy Decl. ¶ 91.

20

137.    For Bates pages 129-131 and 132-134, the withheld information relates to the confidential advice provided directly to the President and his close advisors regarding a national security topic. Hardy Decl. ¶ 93.

138.    Release of this information would reveal the process by which the President receives national security advice from close advisors as directed by President Obama under Presidential Policy Directive-1 (Organization of the National Security Council System), and would reveal information about the advice itself. Hardy Decl. ¶ 93.

139.    For Bates page 144, the withheld information relates to confidential advice provided directly to the President and his close advisors regarding a national security topic. Hardy Decl. ¶ 94.

140.    Release of this information would reveal the process by which the President receives national security advice from close advisors, and would reveal information about the advice itself. Hardy Decl. ¶ 94.

141.    For Bates pages 163-164, the withheld information relates to confidential advice provided directly to the President and his close advisors regarding a national security topic. Hardy Decl. ¶ 96.

142.    Release of this information would reveal the process by which the President receives national security advice from close advisors, and would reveal information about the advice itself. Hardy Decl. ¶ 96.

143.    For Bates page 246, the withheld information relates to confidential advice provided to the President's close advisors regarding a national security topic. Hardy Decl. ¶ 97.

144.    Release of this information would reveal the process by which the President receives national security advice from close advisors, and would reveal information about the advice itself. Hardy Decl. ¶ 97.

## V.    Segregability

145.    Following the segregability review, RIDS determined that 128 pages could be released in part with redactions per the identified FOIA exemptions. Hardy Decl. ¶ 98.

146.    These pages comprise a mixture of material that the FBI was able, with reasonable efforts, to segregate for release to Plaintiffs and material that was redacted because its release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages. Hardy Decl. ¶ 98.

147.    RIDS withheld 116 pages in full. Hardy Decl. ¶ 98.

148.    Of these, 1 page was withheld in its entirety it contained email records not responsive to the FOIA request, and thus is not within the scope of Plaintiffs' requests. Hardy Decl. ¶ 98.

149.    An additional 53 pages were withheld because they were duplicates of other pages processed for release to Plaintiffs in this case. Hardy Decl. ¶ 98.

150.    Finally, RIDS withheld in full 62 pages pursuant to FOIA exemptions. Hardy Decl. ¶ 98.

151.    Any non-exempt information on these 62 pages was so intertwined with exempt material, that no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content. Hardy Decl. ¶ 98.

Dated: March 22, 2019

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   /s/ Johnny Walker
JOHNNY H. WALKER, D.C. Bar #991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Counsel for Defendant*